UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DIXIE FINANCE COMPANY and
RENT 2 OWN CARS, INC.,

Plaintiffs

CASE NO.   3:18-cv-426-RGJ

v.

SCOTT STILLINGS,

*Serve:*

COMPLAINT

*10187 Banet Road*
*Floyds Knob, IN 47119*

CYNTHIA STILLINGS,

*Serve:*

*10187 Banet Road*
*Floyds Knob, IN 47119*

and

DRIVE NATION USA, INC. f/k/a
APPROVED AUTO USA, INC.

Serve:

Cynthia Stillings
2929 9th Street W
Bradenton, FL 34205

Defendants

The Plaintiffs, Dixie Finance Company ("Dixie Finance") and Rent 2 Own Cars, Inc. d/b/a

Approved Auto of America ("Approved Auto" and, collectively with Dixie Finance, the

"Dealership"), by and through the undersigned counsel, state as follows for their Complaint against

the Defendants, Scott and Cynthia Stillings (the "Individual Defendants") and Drive Nation USA,

Inc., f/k/a Approved Auto USA, Inc. ("Drive Nation USA").

## INTRODUCTION AND NATURE OF RELIEF SOUGHT

1.     The Plaintiffs, Dixie Finance Company ("Dixie Finance") and Rent 2 Own Cars,

Inc. d/b/a Approved Auto of America ("Approved Auto") are each Kentucky corporations with

their principal places of business located in Louisville, Kentucky.  Together, they operate as a

"Buy Here, Pay Here" ("BHPH") used car dealership (the "Dealership") located in West Louisville

that provides employment and services to people in the Greater Louisville area.

2.     The Individual Defendants, Scott and Cynthia Stillings, are a married couple that

exercised day-to-day control over all aspects of the Dealership's operations between late 2015 and

through April 16, 2018.

3.     Between January 1, 2015 and November 28, 2017, the Dealership's owners were

James Hutchens, who owned 90% of the stock of both Approved Auto and Dixie Finance, and

Scott Stillings, who received the other 10% of both companies from Mr. Hutchens in consideration

of his continuing services as General Manager of the Dealership (the "2015 Agreement"). After

Mr. Hutchens passed away on November 28, 2017, Mr. Hutchens' probate estate (the "Estate")

succeeded to Mr. Hutchens' 90% ownership interest.

4.     While in control of the Dealership, Individual Defendants flagrantly disregarded

their fiduciary obligations to Approved Auto and Dixie Finance. To conceal their actions, the

Individual Defendants removed, deleted, and/or destroyed thousands of financial and accounting

records in early 2018.

5.     The financial and accounting records recovered to date have revealed that, in 2017

and 2018, the Individual Defendants personally received more than $250,000.00 in cash and

Dealership assets above and beyond the income and distributions disclosed on Dealership tax returns. Notable examples include a $34,500.00 down payment on the Individual Defendants' second home in Bradenton, Florida; the transfer of a vehicle owned by the Dealership to the Individual Defendants for no consideration; the transfer of another 2018 vehicle owned by the Dealership to the Individual Defendants at $8,130 below its cost; $49,663.36 for personal shopping expenses, including $27,105.21 in Amazon.com purchases; $13,137.03 for personal meals and entertainment; $45,229.18 for personal travel expenses; $9,648.25 for gymnastics training and private schooling on behalf of their minor child; $7,430.92 for Cynthia Stillings' student loan (which she then listed as her own personal expense on joint tax returns). *See* **Exhibits 4 - 11** (together with all other transfers of assets to or on behalf of the Stillings that did not constitute authorized salary, wages, or distributions, the "Unauthorized Personal Expenses").

6.      The Dealership's current owners, directors, and officers have not been provided with evidence that Mr. Hutchens approved the Individual Defendants' Personal Expenses prior to November 28, 2017, as required by KRS § 271B.8-310.  Further, the Estate was the sole disinterested party with the power to approve the Personal Expenses after Mr. Hutchens' death on November 28, 2017 and it did not do so.  As set forth below in Counts I and II, the Individual Defendants' use of corporate funds to pay Unauthorized Personal Expenses constitute breaches of their fiduciary duties and conversion.  The Dealership is entitled to compensatory and punitive damages, an accounting, and the imposition of a constructive trust on the assets, proceeds and other private benefits their realized or obtained by their tortious conduct.

7.      In addition to the recovery of Unauthorized Personal Expenses, the Dealership also seeks relief arising out of the Individual Defendants' formation of competing businesses, including Drive Nation USA in Bradenton, Florida, using Dealership intellectual property and assets. In

3

response to these actions, as set forth in Counts III and IV, the Dealership seeks injunctive relief, royalties, compensatory damages, exemplary damages, attorney's fees, and all other relief available for the Individual Defendants' usurpation of corporate opportunities and pursuant to the Lanham Act and Kentucky Uniform Trade Secrets Act.

## PARTIES, JURISDICTION, AND VENUE

8.      The Individual Defendant, Scott Stillings, was the Dealership's General Manager and Vice President between October 2015 and April 16, 2018. Mr. Stillings is a resident of Indiana, and may be served at 10187 Banet Road, Floyds Knob, Indiana. Scott Stillings is the husband of Cynthia Stillings.

9.      The Individual Defendant, Cynthia Stillings, is Mr. Stillings' wife and, at various times between January 1, 2015, acted as the Dealership's primary bookkeeper, human resources director, office manager, and in various other capacities. Cynthia Stillings may be served either at 10187 Banet Road, Floyds Knob, Indiana, the residence she shares with Scott Stillings, or at 2929 9th Street West, Bradenton, Florida 34205, her place of business.

10.      The Defendant, Drive Nation USA, Inc., is a Florida corporation with its principal office in Bradenton, Florida. Drive Nation may be served through its registered agent in Florida, Cynthia Stillings, at 2929 9th Street West, Bradenton, Florida 34205.

11.      The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000.00 and is between citizens of different states.  In addition, the Court has federal question subject matter jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1338(a)-(b), and supplemental jurisdiction over all other asserted claims because they are so related that they are part of the same case or controversy. *See* 28 U.S.C. § 1367.  This Court has personal jurisdiction over the Defendants because they

regularly transact business in Kentucky and committed the below-described tortious acts and omissions in Kentucky, which caused injury to result in Kentucky.  Defendants have numerous, systematic contacts with Kentucky that warrant the exercise of either specific or general personal jurisdiction.

12.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

<u>**STATEMENT OF FACTS COMMON TO ALL COUNTS**</u>

*A.*     *General Background Regarding BHPH Dealerships.*

13.     BHPH dealerships like the Dealership acquire the vehicles they sell at auctions conducted throughout the country, including at many locations within 120 miles from Louisville, Kentucky, and it is therefore more profitable to focus acquisition efforts regionally.

14.     BHPH dealerships are dependent on Floor Plan Financing to fund their acquisitions. "<u>Floor Plan Financing</u>" refers to short-term loans secured by the BHPH dealership's inventory. The consequences of a default are severe, and it is therefore vital that BHPH Dealerships maintain a marketable product that can move quickly and for fair value.

15.     Floor Plan Financing proceeds are intended to be used for the acquisition of vehicles and nothing else. When a dealership sells a vehicle encumbered by Floor Plan Financing and then fails to utilize the proceeds to pay down the Floor Plan Financing, the floor plan facility is said to be "<u>Out Of Trust</u>."

16.     BHPH dealerships like the Dealership generate their business through the use of a website with online inventory and through online advertising efforts, including targeted marketing, references, and recurring customers. Thus, Approved Auto's online advertising expenses have historically totaled several hundred thousand dollars. In 2017 alone, the total amount of advertising expenses exceeded $460,000. Approved Auto's online advertising accounts also maintain records

showing the relative success of specific kinds of marketing efforts and thus retain substantial value as confidential trade secrets long after an advertising campaign has ended.

17.     After a purchaser has located a BHPH dealership through its website or some other media and has made the decision to purchase a car, one of the ways he or she may pay for that vehicle or services related to the vehicle is in the form of cash. Types of cash payments received by the Dealership during the relevant time period include down payments, regular monthly payments, processing fees payable at the time of purchase ("Processing Fees"), fees for limited vehicle warranties ("Warranty Fees"), and payments made by customers to reclaim repossessed vehicles ("Repo Fees").

18.     Because cash receipts expose businesses to a higher risk of various kinds of fraud, both internally and externally, it is important for BHPH dealerships to follow best practices for handling cash, including (a) recording cash payments as line items as they are collected; (b) careful and consistent record-keeping practices; and (c) the segregation of duties, particularly those related to the initial collection of cash, the reconciliation of cash at the end of the day, and the recording of cash entries.

**B.      *Under Defendants' Control, the Dealership Was Insolvent and Out of Trust.***

19.     James Hutchens was one of the Dealership's founding owners and, by January 1, 2015, owned one hundred percent (100%) of the issued and outstanding stock of both Approved Auto and Dixie Finance.  Scott Stillings became the Dealership's General Manager effective January 1, 2015, and, in consideration for his services, was granted ten percent (10%) of the stock of Approved Auto and Dixie Finance.  After Mr. Stillings became the Dealership's General Manager, he hired his wife, Ms. Stillings, to perform the human relations, bookkeeping, and

internal accounting functions at the Dealership. Thus, the Individual Defendants had full operational and financial control of the Dealership from late 2015 onward.

20. Hutchens passed away on November 28, 2017, and his sister, Kathryn, was appointed Executrix of his probate estate (the "Estate") on January 18, 2018.

21. Before and after Mr. Hutchens' death, Mr. Stillings acted in his own personal and financial self-interest, to the detriment of the Dealership.

22. After an investigation detected substantial accounting irregularities, the Estate voted to remove Scott Stillings as a Director and appointed a new Board to act on behalf of both Approved Auto and Dixie Finance. The Board suspended the Individual Defendants without pay on April 16, 2018 pending an investigation, and, on June 22, 2018, terminated the Individual Defendants' employment.

23. Based on the records it has been able to recover, the Dealership has so far been able to identify more than $250,000.00 in transactions initiated by the Defendants over a 15 month period that (a) appear to have personally benefited the Defendants to the exclusion of the Dealership or anyone else, (b) lack any evidence of approval by independent Dealership representatives, and (c) were reported on the Dealership's books and records as Dealership expenses, but not as distributions, salaries, or wages to the Individual Defendants.

**C.    *In Early 2018, the Defendants Destroyed Evidence.***

24. Shortly before the Dealership started its investigation, the Defendants removed and destroyed thousands of financial records, most of which the Dealership has been unable to recover.

25. In late January or early February 2018, Kursten Fudge, a Dixie Finance employee, was directed by Ms. Stillings, through another Dealership employee, to remove all of the Warranty,

Processing, and Repo Fee cash logs from the binders in which they were kept. Ms. Fudge was told that these records were going to be thrown away. *See* Affidavit of Kursten Fudge, **Exhibit 1**.

26.     Around this same time, Mercedes Nix, an employee of Dixie Finance and personal friend of Ms. Stillings, who was one of Ms. Stillings' companions on a company-funded Princess Cruise trip and who recently resigned, was directed to take 6 or 7 boxes of financial records to Ms. Stillings' personal SUV. *See* Affidavit of Mercedes Nix, **Exhibit 2**. Based on Ms. Fudge's sworn affidavit, these records were presumably thrown away or destroyed.

27.     On April 16, 2018, the day they were placed on suspension, the Defendants deactivated the on-premises security camera at the Dealership and removed Dealership property, including four personal computers. They subsequently deleted all of the financial records stored on those computers.

28.     The Individual Defendants' destruction of evidence constitutes the intentional spoliation of evidence, for which sanctions in favor of the Dealership are warranted.

**D.      *Cynthia Stillings Changed Dealership Cash Accounting Procedures In Order to Facilitate the Theft of Hundreds of Thousands of Dollars.***

29.     Before the Stillings' assumed full operational and financial control of the Dealership, cash transactions occurred as follows:   cash receipts were placed in the same register and logged on one sheet that listed total daily cash receipts (the "Daily Cash Log"). Similarly, both Approved Auto and Dixie Finance maintained their own "Cash Disbursement Logs", where staff members recorded the cash disbursements given to employees for day-to-day expenses and other purposes. At the end of each day, receipts and disbursements were reconciled with the cash in the register, and, after reconciliation, the cash was deposited into a time-locked safe linked to the companies' PNC bank accounts.

30.     In late 2015, Ms. Stillings directed Dixie Finance employees to handle cash receipts differently. Employees were instructed to place Warranty, Processing, and Repo Fees into a PNC bank bag, originally labeled "Cynthia's Bag," and to record Warranty, Repo, and Processing Fees on a separate cash log.

31.     Although most of the Cash Disbursement Logs have been deleted, the Plaintiffs were able to recover approximately 50 logs for the time period between October 6, 2015 and February 13, 2018. These cash logs show that $15,204.00 was deposited into "Cynthia's Bag." **Exhibit 3**.

32.     On information and belief, based on the facts that (a) Cynthia Stillings directed the change to cash handling procedures and (b) the Individual Defendants destroyed evidence, the Individual Defendants converted cash Warranty, Repo, and Processing payments to their own personal use.

**E.      *The Defendants Wrongfully Charged Hundreds of Thousands of Dollars of Personal Expenses to the Dealership.***

33.     Deleted but recovered credit card statements reflect that, between December 2015 and March 2018, Scott Stillings charged at least $568,277.00 to his credit cards, and Cynthia Stillings charged at least $174,113.17 to hers. These credit cards were paid using Dealership funds.

34.     Some of these charges appear to have been for Dealership expenses, but many were personal in nature. Examples between January 1, 2017 and March 31, 2018 (which total $172,773.23) include $49,663.36 for personal shopping expenses, including $27,105.21 in Amazon.com purchases; $13,137.03 for personal meals and entertainment; $45,229.18 for personal travel expenses; $9,648.25 for gymnastics training and private schooling on behalf of their minor child; $7,430.92 for Cynthia Stillings' student loan (which she then listed as her own personal expense on joint tax returns). *See* **Exhibits 4 - 10**. The total amount of personal credit

9

card expenses incurred by the Individual Defendants from January 1, 2017 through November 27, 2017 and paid by the Dealership total $99,181.71 (the "Pre-Death Expenses").  The total amount of personal credit card expenses incurred by the Individual Defendants from November 28, 2017 (the date of James Hutchens' death) through March 17, 2018 and paid by the Dealership total $73,591.52 (the "Post-Death Expenses"). *See* **Exhibits 9-10 (the "Post-Death Expenses")**. Many records are still missing, but the Dealership anticipates that additional Unauthorized Personal Expenses will be revealed during discovery.

35.    The Individual Defendants' Unauthorized Personal Expenses were not limited to credit card expenses. For example, on January 18, 2017, Scott Stillings caused Dixie Finance to wire transfer $34,500.00 as a down payment on the Defendants' second home in Bradenton, Florida. *See* **Exhibit 11**.

36.    The Defendants also caused the Dealership to transfer several vehicles to them for no consideration, or for much less than their fair market value, including but not limited to a 2018 Ford Fusion and at least one Chevrolet Tahoe. The collective value of these two vehicles exceeds $50,000.00. To add insult to injury, Mr. Stillings caused the Dealership to pay $3,508.10 in vehicle property taxes for the Chevrolet Tahoe to the Manatee County, Florida Tax Collector on April 4, 2018, shortly before he was suspended pending an investigation into his conduct.

37.    Thus, the Dealership has already detected more than $250,000.00 in Personal Expenses the Defendants charged to the Dealership in little over a year between 2017 and 2018. *See* **Figure 1**.

| Category | Total Amount |
|:---:|:---:|
| Credit Card Expenses | $172,773.23 |
| Florida House Payments | $34,500.00 |

| | |
|---|---|
| Transferred Vehicles | $53,508.10 |

**Figure 1. Personal Expenses**

38.     Because Dealership operating expenses inexplicably increased by $1.8 million between 2014 and 2016, the Dealership anticipates that it has barely scratched the surface of the Defendants' Unauthorized Personal Expenses.

39.     Independent director or shareholder approval of Personal Expenses was required by KRS § 271B.8-310. The Dealership's corporate records contain no evidence that this occurred.

***F.      The Defendants Formed a New Company Called AA Auto Repair, LLC As Another Way to Funnel Assets Outside of the Dealership.***

40.     In addition to its vehicle sales and collections operations, the Dealership also offered inspection, repair and maintenance services to its customers. The Dealership earned approximately $500,000.00 in annual revenue as a result of these operations.

41.     In September 2017, shortly before Mr. Hutchens passed away, the Individual Defendants convinced him to spin this business off into a new company named AA Auto Repair, LLC ("AA Auto Repair"). Mr. Hutchens and Mr. Stillings each owned 50% of AA Auto Repair.

42.     Perhaps this arrangement could have been fair to the Dealership had the Defendants spun off ***all*** of the revenues and expenses associated with repair and maintenance services. However, the Individual Defendants spun off very few of the related expenses, and, on information and belief, instead operated AA Auto Repair as a mechanism for siphoning Dealership assets to an entity in which Stillings held a greater ownership interest.  On information and belief, the Dealership received little to no consideration in exchange for the transfer of its repair and maintenance business to AA Auto Repair.

43.     In December 2017, one week after Mr. Hutchens passed away, the Individual Defendants also placed Ms. Stillings on AA Auto Repair's payroll and used AA Auto Repair to pay her $15,120.00 over the next four-and-a-half months.

**G.**     ***After Mr. Hutchens Passed Away on November 28, 2017, the Defendants Took Salary Payments to Which They Were Not Entitled and Removed or Destroyed Dealership Records in an Attempt to Conceal Their Misdeeds.***

44.     Mr. Hutchens passed away on November 28, 2017. Shortly thereafter, in January 2018, Mr. Hutchens' Estate appointed independent financial professionals to review its assets, including the Dealerships assets, liabilities, and finances.  In January, February and March 2018, the Individual Defendants represented to the Estate and its advisors that the Dealership urgently needed funding in order to stabilize its financial condition and to avoid a default with its lenders. As a result, the Dealership incurred loans totaling $202,000.00 from the Estate and/or Kathryn Hutchens.

45.     However, while simultaneously causing the Dealership to incur this additional indebtedness, the Individual Defendants' continued to incur and pay Unauthorized Personal Expenses with Dealership funds.

46.     Between December 1, 2017 and March 17, 2018, the Individual Defendants incurred at least $73,591.52 in Personal Expenses. *See* **Exhibit 10**. None of these Personal Expenses were authorized by the Estate, the sole disinterested party with the power to approve them.

47.     In addition to these expenditures, the Defendants also unilaterally increased their salaries and awarded bonuses to themselves, causing Scott Stillings to earn $21,400.00 over and above his ordinary salary, and Cynthia Stillings to earn $9,016.00 over and above hers, in little over four months during this same time period.

48.     The Defendants also attempted to withdraw $72,663.75 from the Dealership's bank account on April 16, 2018 in the form of a purported payroll payment. However, the Dealership detected this attempted transaction and prevented it from going through.

**H.     The Defendant Scott Stillings Has Exercised Improper Custody and Control Over Dealership Web Domains and Related Web Marketing Accounts.**

49.     During the investigation described above, the Dealership discovered that Mr. Stillings had registered all Dealership web domains and attached web marketing accounts in his own personal name. These accounts include, but are not limited to:

- The web domains www.approvedauto.us and www.approvedautousa.com;

- A Google Ad Words account used to purchase at least $139,100.00 worth of Google advertising space between February 11, 2017 and March 13, 2018 (see **Exhibit 12**);

- The Google My Business account attached to the Dealership's business information listed by the Google search engine.

50.     These accounts retain the history of the Dealership's advertising campaigns, provide analytical information showing what worked and what did not work, and thus inform future advertising campaigns. This type of information is the result of substantial prior investments and is a quintessential protected trade secret.

51.     Mr. Stillings has returned the www.approvedautousa.com domain but has refused to return the Dealership's other web-based assets.

52.     Mr. Stillings has even professed a lack of knowledge regarding the Google Ad Words account, which defies belief given the fact that he made 275 ad buys using this account, totaling $139,100, between February 11, 2017 and March 13, 2018. *See* **Exhibit 12**.

53.     On information and belief, the Individual Defendants are using or have used the Dealership's intellectual property, along with other Dealership trade secrets, to develop similar

competing businesses in Bradenton, Florida and Indianapolis, Indiana. The Defendants also used Dealership money to lay the groundwork for these businesses, causing the Dealership to pay $21,043.97 for their Florida travel and $8,774.78 for their Indianapolis travel between 2017 and April 2018.

54.     On April 9, 2018, while still employees and fiduciaries of the Dealership, the Individual Defendants formed a business in Bradenton, Florida called Approved Auto USA, Inc., evidencing their blatant intention to usurp Dealership corporate opportunities and intellectual property.

55.     The Individual Defendants recently changed that company's name to Drive Nation USA, Inc. However, they are still using the resources, funds, know-how, and intellectual property they received, often improperly, from the Dealership to develop Drive Nation USA. Thus, Drive Nation USA has participated in and benefited from the Individual Defendants' misconduct.  For instance, the Individual Defendants have simply copied and pasted certain contents -- nearly verbatim -- of the Dealership's website into their competing Drive Nation USA, Inc. website. *Compare* **Exhibit 13** (http://www.approvedautousa.com/what_is_bhph.php (visited July 2, 2018)) *with* **Exhibit 14** (https://www.drivenationusa.com/why-choose-us (visited July 2, 2018)).

## STATEMENT OF FACTS JUSTIFYING SANCTIONS FOR SPOLIATION OF EVIDENCE, INCLUDING THE DRAWING OF ADVERSE INFERENCES

56.     By destroying evidentiary records as described above, the Individual Defendants have engaged in the intentional spoliation of evidence.

57.     Thus, the Dealership is entitled to sanctions against the Individual Defendants, including but not limited to (a) the costs it incurs in its efforts to reconstruct the financial records that the Defendants removed and destroyed and (b) an adverse inference that any records the

Dealership is otherwise unable to reconstruct would have been evidence of Defendants' wrongdoing.

## STATEMENT OF FACTS JUSTIFYING JOINT AND SEVERAL LIABILITY FOR CIVIL CONSPIRACY AND AIDING AND ABETTING

58.    The Individual Defendants each individually agreed to, and entered into, a conspiracy with one another to participate in illegal schemes to (a) siphon off Warranty, Processing, and Repo fee payments received in cash; (b) cause the Dealership to pay their personal expenses; (c) move auto maintenance and repair revenues to AA Auto Repair, while leaving most of the associated expenses at Approved Auto; (d) destroy relevant evidence; and (e) use Dealership resources to form competing enterprises in Bradenton, Florida and Indianapolis, Indiana.

59.    The Individual Defendants each engaged in one or more overt acts in furtherance of the conspiracy, all as more fully set forth above.

60.    Furthermore, the Defendants each intentionally aided and abetted the other in connection with the commission of the various torts

61.    The Defendants are thus jointly and severally liable on each of the causes of action set forth below.

## COUNT I

### Breach of Fiduciary Duty (Against Individual Defendants)

62.    The Plaintiffs repeat and incorporate by reference the above allegations of the Complaint as if set forth at length herein.

63.    Effective January 1, 2015 until April 16, 2018, the Defendant, Scott Stillings, was a Director, the Vice President, and the General Manager of Approved Auto and Dixie Finance.

64.    Between January 2015 and April 16, 2018, the Defendant, Cynthia Stillings had the corporate powers on behalf of Approved Auto and Dixie Finance to (1) open any bank account in

the name of the corporation; (2) endorse certified checks and orders for the payment of money, or to withdraw or transfer funds from Dealership bank accounts; (3) borrow money in the Dealership's name; and (4) endorse mortgages and other security instruments.

65.     Cynthia Stillings also oversaw Dealership books and records and was given the authority to dictate Dealership accounting and cash management policies.

66.     Thus, while nominally the Dealership's Office Manager, Cynthia Stillings was a de facto corporate officer and, with Scott Stillings, fully controlled the operations and finances of both Approved Auto and Dixie Finance.

67.     By virtue of their respective offices and controlling positions, Scott and Cynthia Stillings each owed Approved Auto and Dixie Finance the fiduciary obligations of care, loyalty, and the utmost good faith.

68.     The Defendants have breached their fiduciary obligations by, among other things: (a) misappropriating Dealership funds, including cash Warranty, Processing, and Repo Fees and monies that flowed through AA Auto Repair to the Defendants; (b) using Dealership funds to pay lavish personal expenses; (c) otherwise causing the Dealership to bear excessive expenses that vastly exceeded any additional revenues generated during the Defendants' tenure; (d) registering Dealership accounts in their own name, thus facilitating the misappropriation of Dealership trade secrets; (e) usurping corporate opportunities; and (f) destroying Dealership records.

69.     The Defendants have each conspired with and aided and abetted the other in committing the foregoing tortious acts, and are therefore jointly and severally liable for them.

70.     The Dealership is entitled to recover, jointly and severally from the Defendants, any actual compensatory and consequential damages arising from the Defendants' violations of their fiduciary obligations.

71. The Dealership is entitled to a finding that the Defendants' actions constituted defalcation committed while Defendants were acting in a fiduciary capacity and that the injury caused by the Defendants was willful and malicious.

72. The Dealership is also entitled to an accounting of any profits the Defendants receive (directly or indirectly) including profits disguised as company expenses, as a result of the corporate opportunities they usurped, and the imposition of a constructive trust over the profits.

73. The Dealership is also entitled to the imposition of a constructive trust over any assets, proceeds, or other private benefits the Individual Defendants obtained as a consequence of their breaches of fiduciary duty, including over their ownership interest in their second home in Bradenton, Florida, to the extent paid for with Dealership funds.

74. The Defendants' conduct was intentional, willful, oppressive, fraudulent, and pursued with flagrant reckless disregard for the Plaintiffs' rights. It was the cause of the insolvency of the Dealership, potentially jeopardizing the customers and employees that depended on the Dealership. Their conduct thus displayed actual malice and warrants an award of punitive damages as permitted by statute and common law to punish and deter the Defendants from future conduct of similar nature.

WHEREFORE, the Plaintiffs seek the following relief on Count I of their Complaint:

1. Compensatory damages in an amount to be determined at trial;

2. An accounting of and imposition of a constructive trust on all profits the Individual Defendants receive as a result of the corporate opportunities they have usurped;

3. The imposition of a constructive trust on all assets, proceeds, and private benefits obtained by the Individual Defendants through their breaches of fiduciary duty, including their second home in Bradenton, Florida, to the extent paid with Dealership funds;

4. An award of punitive damages; and

5. Any and all other relief to which Plaintiffs may be entitled.

## COUNT II

### Conversion (Against Individual Defendants)

75.     The Plaintiffs repeat and incorporate by reference the above allegations of the Complaint as if set forth at length herein.

76.     In addition to constituting a violation of their fiduciary obligations, the Defendants' misappropriation of Dealership funds to pay their personal expenses also constituted the tort of conversion under Kentucky law.  The Dealership – not the Individual Defendants – had the right to the possession and use of the Dealership's funds, and the Individual Defendants misappropriation of Dealership funds is inconsistent with the rights of the Dealership in and to its own property.

77.     The Defendants have each conspired with and aided and abetted the other in committing the foregoing tortious acts, and are therefore jointly and severally liable for them.

78.     The Defendants' conversion was intentional, willful, oppressive, fraudulent, and pursued with flagrant reckless disregard for the Plaintiffs' rights. Their conduct displayed actual malice and warrants an award of punitive damages as permitted by statute and common law to punish and deter the Defendants from future conduct of similar nature.

WHEREFORE, the Plaintiffs seek the following relief on Count II of their Complaint:

1.     Compensatory damages in an amount to be determined at trial;

2.     The imposition of a constructive trust on all real and personal property the Defendants acquired using Dealership funds;

3.     An award of punitive damages; and

4.     Any and all other relief to which Plaintiffs may be entitled.

## COUNT III

### Violation of Uniform Trade Secrets Act (Against All Defendants)

79.     The Plaintiffs repeat and incorporate by reference the above allegations of the Complaint as if set forth at length herein.

80.     The customer information generated by the Dealership's Google Ad Words and other web-based marketing accounts constitute trade secrets subject to the protection of the Uniform Trade Secrets Act, KRS § 365.880 *et seq*.

81.     The Dealership's trade secrets derive independent economic value by not being readily ascertainable or accessible through appropriate means to those who can profit or otherwise derive economic value, benefit and advantage from its use or disclosure.

82.     The Dealership has taken reasonable measures under the circumstances to protect its trade secrets, including by making numerous demands for their return.

83.     The Defendants have acquired the Dealership's trade secrets by improper means, namely by violating their fiduciary obligations to maintain the trade secrets as confidential Dealership property.

84.     The Defendants' actions constitute a misappropriation and misuse of the Dealership's confidential trade secret information and were committed intentionally, willfully and maliciously.

WHEREFORE, the Plaintiffs seek the following relief on Count III of their Complaint:

1.     Injunctive relief pursuant to KRS § 365.882;

2.     Pursuant to KRS § 365.884(1), the Plaintiffs' actual loss caused by the misappropriation, as well as the profits the Defendants have unjustly received as a result;

3.      Pursuant to KRS § 365.884(2), exemplary damages in the amount of twice the damages awarded pursuant to KRS § 365.884(1);

4.      Pursuant to KRS § 365.886, their reasonable attorney's fees; and

5.      Any and all other relief to which Plaintiffs may be entitled.

### COUNT IV

**Violation of Lanham Act (Against All Defendants)**

85.      The Plaintiffs repeat and incorporate by reference the above allegations of the Complaint as if set forth at length herein.

86.      Subsection 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), provides, *inter alia*, that "[a] person shall be liable in a civil action by the owner of a mark…if, without regard to the goods or services of the parties, that person – (i) has a bad faith intent to profit from that mark…; and registers, traffics in, or uses a domain name that – (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark…"

87.      The Dealership is the sole owner of the following trademark registration applications for distinctive trademarks (hereinafter referred to as the "Marks"):

a.      The logo depicted below, U.S. Serial Number 8797772:



b.      Approved Auto of America, U.S. Serial Number 87917720 and

c.      Approved Auto USA, U.S. Serial Number 87917794.

88.      The Dealership is also the owner of the following common law, unregistered trademarks (hereinafter also referred to as the "Marks" or, alternately, the "Domains"), all of which are inherently distinctive or possess acquired distinctiveness:

20

      a.      approvedautousa.com;

      b.      approvedauto.us; and

      c.      All derivations thereof.

89.     The Dealership purchases and sells automobiles in interstate commerce. The Marks and Domains are used by the Dealership to market, promote, and sell their products to numerous customers in Kentucky, Indiana, and Ohio.

90.     The Domains also market and promote the Dealership's automobiles to customers throughout the country.

91.     Since at least 2013, the Dealership has used, promoted, and advertised the Marks for its goods and services, both within the Western District of Kentucky and in interstate commerce, and has achieved commercial success and recognition among relevant auctioneers, vendors, and consumers in the auto industry as a result of goods and services sold in connection with the Marks.

92.     There is a substantial demand for the goods and services associated with the Marks, and the goodwill and right to provide goods and services under the Marks are valuable commercial property rights.

93.     The Marks have significance in the minds of consumers in the BHPH marketplace as denoting goods and services coming from, affiliated with, or sponsored by the Dealership.

94.     The Marks are inherently distinctive and/or, alternatively upon information and belief, have acquired distinctiveness (secondary meaning) in connection with the sale of automobiles by the Dealership.

95.     Scott Stillings registered and/or kept the registrations of most, if not all, of the Domains in his personal name with the bad faith intent to profit from the Dealership's Marks.

96.     The Dealership has made demand for the return of the Domains. Scott Stillings has transferred registration of approvedautousa.com back to the Dealership but has failed and/or refused to return approvedauto.us to the Dealership.

97.     As a result, Scott Stillings has damaged the Dealership in an amount to be determined and should be ordered to transfer all of the Domains to the Dealership.

WHEREFORE, the Plaintiffs seek the following relief on Count IV of their Complaint:

1.     Injunctive relief pursuant to 11 U.S.C. § 1116;

2.     Pursuant to 11 U.S.C. § 1117(d), statutory damages in the amount of $100,000.00 for the domain name approvedautousa.com;

3.     Pursuant to 11 U.S.C. § 1117(d), statutory damages in the amount of $100,000.00 for the domain name approvedauto.us;

4.     Pursuant to 11 U.S.C. § 1117(a)(1), the costs of this action, including a reasonable attorney's fee; and

5.     Any and all other relief to which Plaintiffs may be entitled.

Respectfully submitted this 2nd day of July, 2018

/s/ *Brian H. Meldrum*
Brian H. Meldrum
Christopher Rambicure
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main Street, Suite 400
Louisville, KY 40202
bmeldrum@kaplanjohnsonlaw.com
crambicure@kaplanjohnsonlaw.com


*Counsel for Plaintiffs*